**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005,

CAMPAIGN FOR ACCOUNTABILITY
611 Pennsylvania Ave SE # 337.
Washington, DC 20003

Plaintiffs,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, NATALIE J. HARP, *in her official capacity as Executive Assistant to the President of the United States*, DANIEL SCAVINO, *in his official capacity as White House Deputy Chief of Staff and Director of the White House Presidential Personnel Office*, EXECUTIVE OFFICE OF THE PRESIDENT, WHITE HOUSE OFFICE, ROBERT F. KENNEDY JR., *in his official capacity as Secretary of the Department of Health and Human Services*, DEPARTMENT OF HEALTH AND HUMAN SERVICES, SEAN DUFFY, *in his official capacity as Secretary of the Department of Transportation*, DEPARTMENT OF TRANSPORTATION, KASH PATEL, *in his official capacity as director of the Federal Bureau of Investigation, and* FEDERAL BUREAU OF INVESTIGATION,

Defendants.

Case No. 1:26-cv-3258

**COMPLAINT**

## Introduction

1. Before returning to office, President Trump founded a private company, Trump Media & Technology Group ("Trump Media"), to operate a social media platform called Truth Social. President Trump, through a revocable trust managed by his son, is today Trump Media's largest shareholder.

2. Since returning to office, President Trump, federal agencies, and high-level officials have all routinely used Truth Social to disseminate government information to the public. The Trump Administration has made major policy updates, revealed personnel changes, and announced its actions and positions by posting on Truth Social through official accounts.

3. On August 1, 2026, Trump Media began charging for real-time access to posts by certain "top" Truth Social accounts. This product offering, the Truth Application Programming Interface ("Truth API"), costs $100,000 per month—or $60,000 per month for subscribers who sign a three-year commitment.

4. The Truth API covers the Truth Social accounts of President Trump, the White House, Deputy Chief of Staff Dan Scavino, Secretary of the Department of Health and Human Services Robert F. Kennedy Jr., Secretary of the Department of Transportation Sean Duffy, and Director of the Federal Bureau of Investigation Kash Patel.

5. It is no accident that the Truth API covers so many official government accounts. As the CEO of Trump Media explained in a press release, "[m]arkets … move on Truth Social posts." Information the Trump Administration disseminates on Truth Social through its official accounts can have significant consequences for the

global economy. Truth API subscribers—who now receive this potentially market-moving information *before* the rest of the public—can profit on their early knowledge of what the Trump Administration says, does, and believes.

6. Providing government information *first* to approved subscribers who pay up to $100,000 per month to a private company indirectly owned by President Trump, and *then* to members of the public, serves no legitimate public purpose. This two-tier system of access is irrational, inequitable, and illegal under the First and Fifth Amendments to the U.S. Constitution and the Paperwork Reduction Act, which requires "the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public[.]" *See* 44 U.S.C. § 3501(7).

7. Plaintiffs American Oversight and Campaign for Accountability are nonpartisan, nonprofit watchdog organizations that need to, and routinely do, access government information, including information disseminated on Truth Social, to carry out their respective missions. Both organizations have been and will continue to be injured by Defendants' illegal scheme. This Court can and must halt Defendants' corrupt exploitation of the power entrusted to them for their own private gain.

**Parties**

8. Plaintiff American Oversight is a nonpartisan, nonprofit watchdog organization that advances truth, accountability, and democracy by enforcing the public's right to government records. Since launching in March 2017, American Oversight has obtained and published millions of pages of documents from federal, state, and local government agencies. Records uncovered by American Oversight have

supported congressional inquiries, investigative journalism, and independent actions by partner organizations. American Oversight is unwilling and unable to pay a subscription fee for real-time access to Defendants' posts on Truth Social for financial, legal, and ethical reasons.

9. Plaintiff Campaign for Accountability is a nonpartisan, nonprofit watchdog organization dedicated to exposing corruption, negligence, and unethical behavior. One of its current priorities is investigating the federal government and seeking accountability for those who act at the expense of the public good. Campaign for Accountability is unwilling and unable to pay a subscription fee for real-time access to Defendants' posts on Truth Social for financial, legal, and ethical reasons.

10. Defendant Donald J. Trump is the current President of the United States and is sued in his official capacity. President Trump controls an account on Truth Social, @realDonaldTrump, which currently has approximately 13 million followers. President Trump frequently uses this account to make official policy announcements, provide updates regarding the activities of his Administration, and disseminate other information to the public. President Trump's Truth Social account is subject to the paid access restrictions Plaintiffs challenge in this complaint.

11. Defendant Natalie J. Harp is an Executive Assistant to President Trump and is sued in her official capacity. Harp is reportedly the primary White House staffer responsible for helping President Trump post on his Truth Social account. At President Trump's direction, Harp drafts potential posts, which she then

prints out for President Trump's approval; if approved, Harp accesses the @realDonaldTrump account to disseminate the approved post to the public.

12. Defendant Daniel Scavino is the Deputy Chief of Staff to President Trump and Director of the White House Presidential Personnel Office and is sued in his official capacity. Along with Defendant Harp, Scavino reportedly has access to President Trump's Truth Social account and regularly publishes Truth Social posts on @realDonaldTrump on the President's behalf.

13. Defendant Scavino also controls an account on Truth Social, @DanScavino, which currently has approximately 4.4 million followers. Scavino frequently uses this account to make official policy announcements, provide updates regarding the Trump Administration's activities, and disseminate other information to the public. Scavino's account is subject to the paid access restrictions Plaintiffs challenge in this complaint.

14. Defendant Executive Office of the President ("EOP") is a federal entity headquartered in Washington, D.C. Defendants Harp and Scavino are employed within the EOP.

15. Defendant White House Office is a component of the EOP headquartered in Washington, D.C. Defendants Harp and Scavino are employed within the White House Office. The White House Office also controls an account on Truth Social, @WhiteHouse, which currently has approximately 4 million followers. The White House Office frequently uses this account to make official policy announcements, provide updates regarding the Trump Administration's activities,

and disseminate other information to the public. The White House Office's account is subject to the paid access restrictions Plaintiffs challenge in this complaint.

16. Defendant Robert F. Kennedy Jr. is the Secretary of the Department of Health and Human Services ("DHHS"). Secretary Kennedy controls an account on Truth Social, @SecKennedy, which currently has approximately 4 million followers. Secretary Kennedy frequently uses this account to make official policy announcements, provide updates regarding the Trump Administration's activities, and disseminate other information to the public. Secretary Kennedy's account is subject to the paid access restrictions Plaintiffs challenge in this complaint.

17. Defendant Department of Health and Human Services ("DHHS") is a federal entity agency headquartered in Washington, D.C.

18. Defendant Sean Duffy is the Secretary of the Department of Transportation. Secretary Duffy controls an account on Truth Social, @SecDuffy, which currently has approximately 3.8 million followers. Secretary Duffy frequently uses this account to make official policy announcements, provide updates regarding the Trump Administration's activities, and disseminate other information to the public. Secretary Duffy's account is subject to the paid access restrictions Plaintiffs challenge in this complaint.

19. The Department of Transportation ("DOT") is a federal entity headquartered in Washington, D.C.

20. Defendant Kash Patel is the Director of the Federal Bureau of Investigation. Director Patel controls an account on Truth Social, @Kash, which

currently has approximately 1.9 million followers. Director Patel frequently uses this account to make official policy announcements, provide updates regarding the Trump Administration's activities, and disseminate other information to the public. Director Patel's account is subject to the paid access restrictions Plaintiffs challenge in this complaint.

21. Defendant Federal Bureau of Investigation ("FBI") is a federal entity headquartered in Washington, D.C.

## Jurisdiction and Venue

22. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.§ 1331 because the action arises under the constitution and statutes of the United States.

23. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because Defendants are federal officials and agencies headquartered or residing in this district.

## Truth Social

24. Truth Social is a social media platform operated by Trump Media. In function and appearance, Truth Social closely resembles X, the social media platform formerly known as Twitter.

25. President Trump co-founded Trump Media and Truth Social in 2021, after he was barred or suspended from other social media platforms for his role in the events of January 6, 2021.

26. Until his reelection, President Trump was personally the largest shareholder in Trump Media. He transferred his shares to the Donald J. Trump Revocable Trust shortly before his second inauguration.

27. Today, the Donald J. Trump Revocable Trust owns approximately 41.43% of Trump Media. These shares are collectively worth more than $1 billion. The Donald J. Trump Revocable Trust is Trump Media's largest shareholder.

28. The trustee of the Donald J. Trump Revocable Trust is Donald Trump, Jr., President Trump's son. President Trump is the Trust's sole beneficiary.

29. Trump Media is publicly traded on the Nasdaq stock exchange under the ticker "DJT."

30. Trump Media markets Truth Social as an alternative to existing social media platforms that it believes are biased against conservatives and conservative viewpoints.

31. In corporate filings, Trump Media describes Truth Social as "a social media platform established as a safe harbor for free expression amid increasingly harsh censorship by Big Tech corporations."

32. Any individual can sign up for Truth Social by providing their phone number, confirming they are over the age of 18, and agreeing to Truth Social's terms of service.

33. According to these terms of service, Truth Social "seeks to create a free speech haven in the social media sphere" and "encourages [its users'] unencumbered free expression."

34. Users can create a unique "handle" or user address that identifies them on Truth Social (i.e., President Trump's handle is @realDonaldTrump). Using their handles, Truth Social users can publish posts with video, images, and text; comment on, like, and share posts by other users; and follow other users.

35. Everyone who signs up for Truth Social is automatically made a follower of numerous official government accounts including @realDonaldTrump, @DanScavino, @WhiteHouse, @SecKennedy, and @SecDuffy.

36. President Trump's involvement in Truth Social is central to the platform's business model and Trump Media's long-term viability.

37. Trump Media has a "License, Likeness, Exclusivity and Restrictive Covenant Agreement" with President Trump.

38. This agreement allows Trump Media to use the President's name and likeness commercially and obligates him to make certain social media posts exclusively on Truth Social. For covered posts, President Trump must "refrain from making the same post on another social media site for 6 hours."

39. In its 2025 Annual Report, Trump Media explained that its "business plan relies on President Donald J. Trump bringing his former social media followers to [Trump Media's] platform." Should something "cause [President Trump's] followers to lose interest in his messages"—or if users "prefer a platform that is not associated with President Donald J. Trump"—then "the number of users of [Truth Social] could decline or not grow as we have assumed."

40. The Annual Report includes a section on "Risks Related to President Donald J. Trump." According to Trump Media, its success depends "on the popularity of its brand and the reputation and popularity of President Donald J. Trump." Its "brand may diminish if the popularity of President Donald J. Trump were to suffer."

41. The Annual Report explains that if President Trump were to "discontinu[e] or limit[] … his use of" Truth Social it "would negatively impact [Trump Media's] business." The "loss of [President Trump's] services[] could adversely affect [Trump Media's] revenues, results of operations and its ability to maintain or generate a consumer base."

42. The Annual Report notes that the Donald J. Trump Revocable Trust's significant ownership stake "limits or precludes other stockholders' ability to influence the outcome of matters submitted to stockholders for approval."

43. The Donald J. Trump Revocable Trust's ownership stake gives President Trump an ongoing and substantial interest in Trump Media's success.

44. Other members of the Trump Administration have also maintained close ties to, and economic interests in, Trump Media.

45. Multiple former Trump Media board members currently serve in President Trump's administration, including Director Patel and Secretary of the Department of Education Linda McMahon.

46. One week after President Trump's second inauguration, while Patel and McMahon's nominations were pending before the Senate, Trump Media awarded both appointees more than 25,000 shares.

47. Until April 2026, the CEO of Trump Media was Devin Nunes. For more than a year, Nunes served concurrently as Trump Media CEO and as the Chair of President Trump's Intelligence Advisory Board.

48. President Trump announced Nunes's appointment to the Intelligence Advisory Board via a post on Truth Social.

49. The current Chair of Trump Media's Board of Directors is Boris Epshteyn. Epshteyn concurrently serves as Trump Media Board Director and as Senior Counsel and Senior Advisor to President Trump.

50. Another member of Trump Media's Board is Meredith O'Rourke. O'Rourke concurrently serves as a Member of the Trump Media Board and as the chief fundraiser for President Trump's political operation.

51. According to a report in the Wall Street Journal, President Trump calls O'Rourke "[a]lmost every night," and she is "often at Trump's side in the White House and elsewhere." O'Rourke "sometimes sits in on meetings, including when Trump meets with corporate executives," "travels with top officials on Air Force One," and "often posts photos of herself with Trump, including in the Oval Office."

52. Another member of Trump Media's Board is David Bernhardt, who served as Secretary of the Interior in the first Trump Administration. Bernhardt served on the transition team to prepare for President Trump's return to the White House in 2024. He replaced Defendant Patel on the Trump Media Board.

53. From 2021 through 2024, Trump Media paid Defendant Scavino millions of dollars in consulting fees. At the time, Scavino was a director of a special-

purpose acquisition company that had announced a merger with Trump Media to bring the companies public.

54. As part of Trump Media's arrangement with Scavino, Trump Media issued him a promissory note worth $4 million in 2024. Scavino subsequently reported selling an interest in Trump Media valued between $1 and $5 million.

55. Other current members of the Trump Administration continue to hold significant amounts of stock in Truth Social, including Scott Glabe, who serves concurrently as a member of the President's Intelligence Advisory Board and as General Counsel and Secretary for Trump Media.

56. Members of the Trump Administration have traded shares in Trump Media while serving in government.

57. For example, then–Attorney General Pam Bondi sold between $1 and $5 million worth of Trump Media shares on the same day President Trump announced (via Truth Social post) that he was imposing new global tariffs. Trump Media's stock price declined more than 10% over the next few days.

## **The Government's Use of Truth Social as an Official Communications Channel**

58. President Trump, members of his administration, and federal agencies routinely use Truth Social to disseminate government information to the public in their official capacities.

59. Although Trump Media's licensing agreement with President Trump permits him to make posts "related to government, politics, or similar topics . . . on

any social media site at any time," President Trump has consistently used the @realDonaldTrump Truth Social account to make major policy announcements.

60. President Trump frequently disseminates government information to the public first and exclusively on Truth Social—he posts text and videos directly communicating information about his Administration's policies and actions to the public via @realDonaldTrump post (rather than linking to public information that has already been disseminated in another forum), and he does not disseminate that information anywhere else.

61. For example, on January 3, 2026, President Trump announced via post on Truth Social that the U.S. had "carried out a large scale strike against Venezuela" and captured its leader, then-President Nicolas Maduro.

62. When reporters reached out to the White House for comment, "[t]he White House directed [reporters] to President Trump's post on Truth Social."

63. On February 18, 2026, President Trump announced via post on Truth Social that the U.S. government had informed the British government of its opposition to Britain's plan to cede control of Diego Garcia, an island in the Indian Ocean that hosts an American air base, to the government of Mauritius.

64. When asked about the U.S. government's position on Diego Garcia in a subsequent press conference, then–Press Secretary Karoline Leavitt told reporters that President Trump's Truth Social post "should be taken as the policy of the Trump administration" because it came "straight from the horse's mouth." Leavitt explained that "[w]hen you see it on Truth Social, you know it's directly from President Trump."

65. On August 18, 2026, President Trump provided an update on the status of the Iran war via a post on his Truth Social account, announcing that there were "no talks or conversations going on, or scheduled, with the Islamic Republic of Iran," that the U.S. government's "Naval Blockade remains in full force and effect," and that "[t]he Hormuz Strait is open and operating" and "[a]ll water mines have been removed or detonated."

66. On September 1, 2026, President Trump announced via a post on Truth Social that he was nominating Hung Cao to be the next Secretary of the Navy.

67. On September 7, 2026, President Trump announced via a post on Truth Social, amid ongoing trade negotiations with Canada, that there would be "NO MORE SELLING BOMBARDIER"—a Canadian aerospace company—"IN THE UNITED STATES." He explained that if Canada "want[s] our Market, they must build here."

68. Other members of the Trump Administration have similarly used Truth Social in their official capacities as a government-approved channel for disseminating policy announcements and other information to the public.

69. Like President Trump, other Defendants routinely make policy announcements and disseminate government information to the public on Truth Social—they post text and videos containing government information using their accounts on the platform (rather than linking to announcements made in other fora).

70. On August 17, 2026, Deputy Chief of Staff Scavino posted on his Truth Social account a video recap of a Trump Administration cabinet meeting at Camp David which included interviews with multiple high-ranking government officials.

71. That same day, the White House Office posted on its Truth Social account a message announcing a $22.9 billion contract between the Department of Defense and the private company Raytheon to produce Tomahawk missiles.

72. On September 1, 2026, the White House Office posted on its Truth Social account that President Trump had "secure[d] access to more than 65 BILLION barrels of oil reserves in Venezuela," which it claimed would provide "[s]table, low-cost energy" at "ZERO COST TO U.S. TAXPAYER[S]."

73. On September 4, 2026, the White House Office posted on its Truth Social account that President Trump had "launched a whole-of-government effort to protect & fully support America's ranchers" that included "updat[ing] compensation for predator losses" and "review[ing] country-of-origin labeling for beef."

74. On June 18, 2026, Secretary Kennedy posted a message on Truth Social disputing public reporting that the Centers for Disease Control, which he oversees, had already spent $1.24 billion to purchase COVID-19 vaccines for the upcoming respiratory illness season.

75. On August 14, 2026, Secretary Kennedy posted a video on Truth Social announcing reforms to the Temporary Assistance for Needy Families program, including the imposition of new work requirements.

76. On August 18, 2026, Secretary Kennedy posted a video of his tour of a Head Start facility in Tennessee along with a message announcing his department's effort to invest in and reform the program.

77. On August 27, 2026, Secretary Kennedy posted "new legal guidance" responding to an allegation regarding former National Institute of Health Director Dr. Anthony Fauci, "mak[ing] clear that HHS officials who solicit personal award nominations from entities funded, regulated, contracted, or otherwise engaged by programs they oversee warrant investigation under federal ethics standards."

78. Secretary Kennedy's account on Truth Social identifies @seckennedy as the "Official page of [D]HHS Secretary Robert F. Kennedy Jr."

79. On DHHS's official government webpage, @seckennedy is listed as an "official social media account[] of [D]HHS."

80. On August 9, 2026, Secretary Duffy announced on Truth Social that, under his direction, DOT was initiating rulemaking to permanently require interstate truck drivers to be proficient in English. In the subsequent weeks, Secretary Duffy provided numerous updates on Truth Social about DOT's and other agencies' efforts to address this purported issue.

81. On August 19, 2026, Secretary Duffy posted a video on Truth Social from an airport in Palm Beach, Florida that had recently been renamed the President Donald J. Trump International Airport. In the video, Secretary Duffy conducts a phone call with President Trump, during which the President states that his government is going to invest "a lot of money" in the airport.

82. On August 30, 2026, Secretary Duffy posted on Truth Social what he characterized as "BIG NEWS ON DRONE DELIVIRIES," announcing that the Federal Aviation Administration was expanding an initiative to "tak[e] real-world

testing to broader, everyday airspace across the country" and permitting drones to carry heavier packages, at higher altitudes, and for longer distances.

83. On August 31, 2026, Secretary Duffy posted an announcement on Truth Social that the DOT was investing more than $1 billion to replace an aging bridge in connecting Minnesota and Wisconsin, and that construction on the project had begun.

84. On Truth Social, Secretary Duffy identifies himself as the "20th Secretary of Transportation serving under the leadership of President Trump."

85. Secretary Duffy's Truth Social account is listed as an official social media account on the DOT's official government webpage.

86. On August 14, 2026, Director Patel announced on Truth Social that the FBI was confirming the release of an American missionary who had been abducted by terrorists in Niger.

87. On August 26, 2026, Director Patel announced on Truth Social that the Department of Justice had renewed the charter of the Criminal Intelligence Coordinating Council, which "helps the FBI and our law enforcement partners coordinate responses, establish critical standards, and share lifesaving criminal intelligence."

88. On August 27, 2026, Director Patel posted on Truth Social numerous crime rate indicators that he claimed had declined since President Trump took office.

89. On September 1, 2026, Director Patel announced on Truth Social that the FBI, working with international partners, and secured the extradition of "a former FBI Ten Most Wanted fugitive" from Honduras to face trial.

90. On September 3, 2026, Director Patel announced on Truth Social that the FBI was "putting cutting-edge technology directly into the hands of" FBI agents and implementing new technologies at the agency including "AI," "computer vision," "machine learning," and "biometric" tools.

91. On September 6, 2026, Director Patel announced on Truth Social that "[f]ive individuals in New Jersey, Wisconsin, and Pennsylvania—including two alleged illegal aliens—are accused of casting ballots they were not legally entitled to cast," and that the FBI would "investigate every credible allegation of election fraud and illegal voting, following the facts wherever they lead."

92. Director Patel identifies himself as the "Director of the Federal Bureau of Investigation" on his @Kash Truth Social page.

93. Director Patel ends many of his Truth Social posts with the phrase "DKPus" which, on information and belief, is an acronym for "Director Kash Patel, United States."

94. Subject to Truth Social's general terms of service, other Truth Social users can and do like, comment on, and share posts by Defendants communicating policy announcements and other official government information.

95. Beyond the terms specified in Truth Social's general terms of service, Defendants do not moderate the communicative activities of other Truth Social users who access their posts on Truth Social.

## The "Truth API" Scheme

96. Historically, Trump Media has generated most of its revenue by selling advertising for products and services on Truth Social. These ads are displayed as posts in users' Truth Social feeds.

97. Trump Media has also expanded into unrelated businesses, including purchasing large quantities of Bitcoin and announcing a merger with a nuclear fusion startup.

98. Trump Media reported approximately $900,000 in revenue in the first quarter of 2026 and a net loss of nearly $406 million.

99. On July 16, 2026, Trump Media introduced a new product offering: "Truth API," which it described in a press release as a "data feed that provides licensed, real-time access to posts from the highest-ranking Truth Social accounts."

100. API stands for "Application Programming Interface." In essence, an API is a set of instructions that allows two computer systems to exchange information with each other.

101. Truth API provides paying subscribers with priority access to posts from the ten most popular accounts on Truth Social. It does this by sending subscribers a near-instantaneous feed of data that allows subscribers' computer systems to access and digest posts *before* those posts are viewable by other Truth Social users.

102. Truth API subscribers will also receive access to "a historical archive of posts dating back to 2022" including, on information and belief, posts that have since been altered or deleted.

103. The fee for a Truth API subscription is $100,000 per month, or $60,000 per month for users who commit to subscribing for at least three years.

104. Among the ten most popular Truth Social accounts covered by the Truth API are multiple accounts maintained by high-ranking government officials and government agencies, including Defendants President Trump (@realDonaldTrump), Deputy Chief of Staff Scavino (@DanScavino), the White House Office (@WhiteHouse), Secretary Kennedy (@SecKennedy), Secretary Duffy (@SecDuffy), and Director Patel (@Kash),

105. Truth API subscribers receive access to all posts on Truth Social from these accounts, including posts communicating policy announcements or other official government information, before all other Truth Social users and the public.

106. The imposition of tiered access to Truth Social posts is what makes Truth API attractive to potential subscribers: even a short delay in releasing information to the public can give investors time to trade on information that has not been disclosed to the public or monetize that information in other ways.

107. Access to government information before it is disseminated to the public is core to the Truth API's value proposition. According to the Financial Times, "a pitch deck shared with potential clients … documented [ten] market-moving [Truth Social] posts by" President Trump, including his "post on the 'liberation day' tariffs last year which sent stocks down 12 per cent and another about hitting Iran 'very hard' in June which sent oil soaring."

108. To ensure Truth API maintains its value proposition, Trump Media restricts the ability of third parties to develop and utilize their own tools to obtain real-time access to public information posted on Truth Social feeds covered by the Truth API. In an interview, Trump Media's CEO promised that the company was "going to create a lot of friction for those folks that aren't coming to us directly" (i.e., by purchasing Truth API).

109. Trump Media has also stated it will make it more difficult for third parties to scrape Truth Social feeds using their own programming tools, in ways that could jeopardize the ability of third parties to collect and compile Defendants' Truth Social posts to create their own archives.

110. According to Trump Media's CEO, the number of Truth API subscribers was in the "mid-teens" as of August 24. If all subscribers paid the reported price of $100,000 per month, that would mean Trump Media has booked well over $1,000,000 from Truth API subscriptions in August alone—or more revenue in a month than the company booked from all sources in the first quarter of 2026.

111. At least one Truth API subscriber is a financial news organization.

112. The dramatic uptick in Trump Media revenue promises to directly benefit President Trump and other governmental shareholders in Trump Media, who can expect to see the value of their stake in Trump Media increase if Truth API proves to be a continuing revenue stream for the company.

113. For this reason, President Trump has an incentive to make Truth API attractive to current and potential subscribers. Increasing numbers of Truth API subscribers translate into more money for the President, his family, and his allies.

114. To make Truth API successful, then, President Trump has an incentive to post potentially market-moving policy announcements and other government information first and exclusively on Truth Social, and to encourage the officials and agencies that comprise his administration to do the same.

115. President Trump has, on multiple occasions since returning to office, used his social media accounts to associate himself with Truth Social, including by calling it "my Voice[] and the Real Voice of America," and encouraging his followers to "[s]ign up TODAY."

116. Although Truth API reportedly only covers the ten most popular accounts on Truth Social today, Trump Media's CEO has confirmed that "the API can be expanded to more accounts for customers willing to pay more."

117. It is unclear whether eligibility to subscribe to Truth API is available to anyone who pays the fee, or only to people who pay the fee and are also approved by Trump Media.

118. Nothing prevents Trump Media from expanding Truth API to provide for a greater lag time between post access for Truth API subscribers and the public. Doing so would increase the value that Trump Media can provide to subscribers through the Truth API service.

**How Truth API Burdens Plaintiffs**

119. Through research and public records requests primarily made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Plaintiff American Oversight uses the information it gathers, and its analysis of that information, to educate the public about the activities and operations of the federal government, including the actions of presidential administrations, through reports, published analyses, press releases, and other media.

120. To inform its research and to shape its FOIA requests, American Oversight regularly tracks the activities of the government through social media, including posts by federal officials and members of the Trump Administration, on platforms where entities and officials have accounts, including Truth Social.

121. American Oversight relies on the ability to have access to information at the time it is disseminated to vindicate its mission of educating the public about government activities and seeking accountability for misconduct by government officials. Any delay in its ability to access public information impedes its ability to carry out that mission.

122. American Oversight regularly submits FOIA requests to agencies based in part on public information posted on social media posts. Any delay in receiving that public information could delay the submission of a FOIA request and the production by agencies of non-exempt responsive documents.

123. As a direct result of Defendants' actions, American Oversight now receives delayed access to official information the government chooses to post on Truth Social relative to Truth API subscribers, subject to Trump Media's entirely

discretionary choice of when (and whether) to make these posts available to the public.

124. American Oversight also regularly relies on older content to inform its work, including content from past posts by federal officials and members of the Trump Administration on Truth Social and other social media platforms.

125. Access to the original versions of social media posts that were later altered or deleted is valuable to American Oversight's investigations, as that material can, for instance, reveal changes in policy positions, call into question the accuracy of current statements or reporting, or demonstrate activity on a particular topic over time.

126. Defendants' actions, and their willingness and ability to limit or prevent non-Truth API subscribers from accessing historical Truth Social posts and maintaining their own archives, jeopardizes American Oversight's access to archived Truth Social content—which may include past posts by federal officials and members of the Trump Administration that have since been altered or deleted.

127. As part of their investigatory activities, Plaintiff Campaign for Accountability routinely accesses government information wherever it is publicly disseminated, including on Defendants' Truth Social accounts.

128. When Campaign for Accountability learns information that indicates the possibility that government officials or corporations have engaged in corrupt dealings, it moves immediately to launch an investigation. Because its investigations are the basis for actions it undertakes to stop corruption—for example, by sharing

what it has learned with regulators or the public and by filing complaints with the relevant authorities—any delay in its ability to access public information impedes its ability to carry out its mission.

129. As a direct result of Defendants' actions, Campaign for Accountability now receives delayed access to official information the government chooses to post on Truth Social relative to Truth API subscribers, subject to Trump Media's entirely discretionary choice of when (and whether) to make these posts available to the public.

## Claim for Relief

***Count One*: Violation of the First Amendment to the U.S. Constitution against all Defendants (right to listen).**

130. Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

131. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I.

132. The First Amendment protects a listener's right to receive information and ideas as a corollary to its protection of freedom of speech and of the press.

133. Once the government chooses to disseminate information to the public, members of the public have a First Amendment right to access that information.

134. Restrictions on this right of access are only permitted if they further an important or substantial government interest and are not arbitrary.

135. Enriching a private company owned by the President and his family is not a legitimate public purpose.

136. There is no legitimate public purpose served by the government limiting real-time access to information it disseminates publicly via Truth Social posts to investors who are willing and able to pay a private company owned by the President up to $100,000 per month.

137. It does not cost $100,000 per month for the government to disseminate information to the public via Truth Social post.

138. Throttling Plaintiffs' access to government information posted on Truth Social because they are unwilling and/or unable to pay $100,000 per month to a company owned by the President burdens Plaintiffs' First Amendment rights by restricting their right to access information the government has chosen to disseminate to the public.

139. This restriction on Plaintiffs' access to Defendants' Truth Social posts is attributable to the federal government because Defendants are the President, federal government officials, and agencies of the federal government who choose to disseminate government information in their official capacities on Truth Social. In so doing, Defendants ratify and adopt the policy that Truth Social users who do not subscribe to Truth API receive delayed access to their posts.

140. Alternatively or additionally, this restriction is enforced by a company that is pervasively entangled and in a symbiotic relationship with the federal government.

141. Because Defendants' actions restrict Plaintiff's ability to receive official information that the government has chosen to disseminate to the public, and

because no legitimate government interest justifies the restriction, Defendants' actions are unlawful under the First Amendment.

***Count Two*: Violation of the First Amendment to the U.S. Constitution against all Defendants (restrictions on access to public forum)**

142. Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

143. Defendants all have actual authority to speak on behalf of the federal government through their official accounts on Truth Social.

144. Defendants have all purported to exercise that authority in communicating government information to the public via their official accounts on Truth Social.

145. Defendants Truth Social accounts, and posts on those accounts disseminating government information to the public, are designated public fora.

146. Plaintiffs have a First Amendment right to access these designated public fora.

147. By participating in a scheme that provides Truth API subscribers faster and more complete access to Defendants' Truth Social posts, Defendants have restricted Plaintiffs' access to government information.

148. Restrictions on access to a designated public forum are only justified if they are narrowly tailored to serve a significant government interest.

149. Enriching a private company owned by the President and his family is not a significant government interest.

150. This restriction on Plaintiffs' access to Defendants' Truth Social posts is attributable to the federal government because Defendants are the President, federal government officials, and agencies of the federal government who choose to disseminate government information in their official capacities on Truth Social. In so doing, Defendants ratify and adopt the policy that Truth Social users who do not subscribe to Truth API receive delayed access to their posts.

151. Alternatively or additionally, this restriction is enforced by a company that is pervasively entangled and in a symbiotic relationship with the federal government.

152. Because Defendants' actions restrict Plaintiffs' rights to access government information in designated public fora, and because no significant governmental interest justifies the restriction, Defendants' actions are unlawful under the First Amendment.

***Count Three*: Violation of the Fifth Amendment to the U.S. Constitution against all Defendants (equal protection)**

153. Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

154. When the federal government draws distinctions between classes of citizens, the Fifth Amendment's Due Process Clause requires that those classifications bear a rational relationship to a legitimate governmental purpose.

155. A classification that burdens a fundamental right is subject to strict scrutiny, and may only be maintained if it furthers a compelling governmental interest and is narrowly tailored to achieve that interest.

156. The Truth API scheme draws a classification between individuals who pay Trump Media up to $100,000 per month, on the one hand, and all other members of the public including Plaintiffs, on the other.

157. This classification is attributable to the federal government because Defendants are the President, federal government officials, and agencies of the federal government who choose to disseminate government information in their official capacities on Truth Social. In so doing, Defendants ratify and adopt the policy that Truth Social users who do not subscribe to Truth API receive delayed access to their posts.

158. Alternatively or additionally, this restriction is enforced by a company that is pervasively entangled and in a symbiotic relationship with the federal government.

159. This classification burdens the exercise of Plaintiffs' fundamental First Amendment rights to access information the federal government has chosen to disseminate to the public.

160. Enriching a private company owned by the President and his family is neither a legitimate nor a compelling government interest.

161. Even if requiring payment of a fee to a private company for access to official government information served some legitimate governmental purpose, requiring a fee of $100,000 per month, which greatly exceeds any costs associated with the production and dissemination of official government information on Truth Social, is neither rationally related nor narrowly tailored to achieving that purpose.

162. Because Defendants' classification serves no legitimate governmental purpose, let alone a compelling government interest, Defendants' actions are unlawful under the Fifth Amendment.

***Count Four*: Violation of the Fifth Amendment to the U.S. Constitution against all Defendants (unconstitutional condition)**

163. Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

164. The Due Process Clause of the Fifth Amendment prohibits the government from imposing conditions on the exercise of constitutional rights that effectively deny those rights by making it too costly to exercise them.

165. Plaintiffs have a First Amendment right to access government information disseminated to the public on equal terms as anyone else.

166. By preventing Plaintiffs from accessing public information in real-time unless they pay up to $100,000 a month to a private company owned by President Trump and his family, Defendants have imposed a severely onerous condition on Plaintiffs' exercise of their First Amendment rights.

167. Imposition of this condition does not further any legitimate government interest.

168. Even if this condition does serve a legitimate government interest, the magnitude of the payment is so grossly excessive compared to whatever costs the government incurs to disseminate public information on Truth Social as to be coercive.

169. Imposition of this condition is attributable to the federal government because Defendants are the President, federal government officials, and agencies of the federal government who choose to disseminate government information in their official capacities on Truth Social. In so doing, Defendants ratify and adopt the policy that Truth Social users who do not subscribe to Truth API receive delayed access to their posts.

170. Alternatively or additionally, this restriction is enforced by a company that is pervasively entangled and in a symbiotic relationship with the federal government.

171. Defendants' imposition of a coercive condition on Plaintiffs' exercise of their First Amendment rights violates the Fifth Amendment's Due Process Clause.

***Count Five*: Violation of the Administrative Procedures Act against Defendants Scavino, Executive Office of the President, White House Office, Robert F. Kennedy Jr., Department of Health and Human Services, Sean Duffy, Department of Transportation, Kash Patel, and the Federal Bureau of Investigation (inequitable access to official government information)**

172. Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

173. Under the Administrative Procedure Act (APA), a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

174. The Paperwork Reduction Act "provide[s] for the dissemination of public information on a timely basis, on equitable terms, and in a manner that promotes the utility of the information to the public[.]" *See* 44 U.S.C. § 3501(7).

175. Defendants Executive Office of the President, White House Office, Department of Health and Human Services, Department of Transportation, and Federal Bureau of Investigation are all agencies within the meaning of the Paperwork Reduction Act.

176. Every federal agency, entity, and official subject to the Paperwork Reduction Act "shall . . . ensure that the public has timely and equitable access to the agency's public information." 44 U.S.C. § 3506(d)(1).

177. When an agency, entity, or official "provides public information maintained in electronic format," they are obligated to "provid[e] timely and equitable access to the underlying data." 44 U.S.C. § 3506(d)(1)(b).

178. Except where expressly authorized by statute, an agency, entity, or official subject to the Paperwork Reduction Act shall not establish an exclusive, restricted, or any other distribution arrangement that interferes with timely and equitable availability of public information to the public.

179. An agency, entity, or official subject to the Paperwork Reduction Act shall not permit others to establish on their behalf an exclusive, restricted, or other distribution arrangements that interferes with the agency's ability to disseminate its public information on a timely and equitable basis.

180. Posts that Defendants the White House Office, Scavino, Kennedy Jr., Duffy, and Patel make in their official capacities on the Truth Social feeds named in this complaint are public information within the meaning of the Paperwork Reduction Act.

181. Public information disseminated to the public via Truth Social posts by accounts covered under the Truth API is not accessible on an equitable basis to both Plaintiffs and Truth API subscribers.

182. The underlying data for public information disseminated to the public via Truth Social posts by accounts covered under the Truth API is not accessible on an equitable basis to both Plaintiffs and Truth API subscribers.

183. Defendants Executive Office of the President, White House Office, Department of Health and Human Services, Department of Transportation, and Federal Bureau of Investigation—as well as Defendants Scavino, Kennedy, Duffy, and Patel—have, by disseminating public information through posts on Truth Social accounts covered by the Truth API, established and acquiesced in the establishment of a method of disseminating public information that interferes with their obligations to ensure the equitable availability of public information to the public.

184. Plaintiffs have suffered injuries as a result of these Defendants' actions in the form of delayed access to public information they require to perform activities central to their missions.

185. By disseminating public information through Truth Social accounts covered by the Truth API, Defendants Executive Office of the President, White House Office, Department of Health and Human Services, Department of Transportation, and Federal Bureau of Investigation—as well as Defendants Scavino, Kennedy Jr., Duffy, and Patel—have taken final agency action not in accordance with the legal requirements of the Paperwork Reduction Act.

186. By failing to comply with the requirements of the Paperwork Reduction Act when disseminating public information on Truth Social, Defendants Executive Office of the President, White House Office, Department of Health and Human Services, Department of Transportation, and Federal Bureau of Investigation—as well as Defendants Scavino, Kennedy Jr., Patel, and Duffy—have violated the APA.

***Count Six*: Violation of the Fifth Amendment to the U.S. Constitution against all Defendants (unconstitutional delegation), in the alternative.**

187. The Due Process Clause of the Fifth Amendment forbids the government from delegating to an economically self-interested entity the power to regulate its competitors without adequate supervision and control.

188. By posting official government information initially and/or exclusively on Truth Social, Defendants have effectively delegated to Trump Media the authority to regulate how the public accesses official government information that Defendants have chosen to disseminate to the public.

189. Trump Media is an economically self-interested entity.

190. Trump Media generates revenue by providing users with rapid access to official government information, including information disseminated by President Trump.

191. Trump Media competes with other entities that disseminate official government information to the public, including news organizations and watchdog nonprofits. Once members of the public see official government information in another forum, they have fewer reasons to visit Truth Social, depriving Trump Media of ad revenue.

192. If government information is disseminated to the public on an equitable basis on platforms or through channels other than Truth Social, there is less incentive for customers to subscribe to the Truth API.

193. Trump Media has imposed restrictions on how its competitors, including individuals and entities like Plaintiffs that are also engaged in the business of disseminating information to the public, access official government information.

194. These restrictions are regulatory in nature: competitors are required to pay a fee for real-time access to Truth Social posts used to communicate official government information, and Trump Media imposes restrictions and limits to deter competitors from developing their own tools to obtain real-time access to these posts without paying the fee to Trump Media.

195. The federal government has no legal mechanism for monitoring, supervising, or changing how Trump Media regulates its competitors' access to official government information.

196. Given how much of its overall revenue is derived from Truth API subscriber fees, Trump Media has a significant economic interest in maintaining and even increasing the costs to its competitors of accessing official government information.

197. Allowing Trump Media to exercise regulatory power without adequate government supervision is fundamentally unfair to Plaintiffs, who are subject to regulations designed and enforced for the explicit and exclusive purpose of generating profit for another market participant, Trump Media.

198. Defendants' delegation of the authority to impose access restrictions on official government information to Trump Media violates Plaintiffs' due process rights.

## Prayer for Relief

Plaintiffs respectfully request that this Court:

- Declare that Defendants' practice of disseminating government information using official government Truth Social accounts subject to the Truth API is unconstitutional and unlawful;
- Enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from posting, or allowing to be posted, public information on Truth Social using official government accounts subject to the Truth API;
- Award Plaintiffs' reasonable costs and attorneys' fees incurred in this action; and
- Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
D.C. Bar No. 1033346
Samuel Jacob Davis*
Gerstein Harrow LLP
1319 F St., NW, Suite 301
Washington, DC 20004
charlie@gerstein-harrow.com
samdavis@gerstein-harrow.com
(202) 670-4809

**pro hac vice forthcoming*

Jason Harrow
Gerstein Harrow LLP
12100 Wilshire Blvd., Suite 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

Loree Stark
D.C. Bar No. 90021926
Emma Lewis
D.C. Bar No. 144574
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
loree.stark@americanoversight.org
emma.lewis@americanoversight.org
(304) 913-6114